IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| JAMEY S. MIRACLE | ) | |
| | ) | |
| v. | ) | No. 3:06-0918 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security[1] | ) | |

To: The Honorable John T. Nixon, Senior District Judge

## **REPORT AND RECOMMENDATION**

The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), as provided by the Social Security Act ("the Act").

Upon review of the Administrative Record as a whole, the Court finds that the Commissioner's determination that the plaintiff could perform his past relevant work as an engraver and, therefore, other substantial gainful activity during the relevant time period is not supported by substantial evidence in the record as required by 42 U.S.C. § 405(g), and that the plaintiff's motion for judgment on the record (Docket Entry No. 14) should be granted to the extent that the case should be remanded to the ALJ.

---

[1] Michael J. Astrue is automatically substituted for his predecessor Jo Anne Barnhart as Commissioner of Social Security pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

# I. INTRODUCTION

The plaintiff filed an application for DIB on May 2, 2002, alleging disability due to rapid cycling bipolar disorder, spinal instability, and an L5-S1 fusion, with an alleged onset date of January 29, 2002. (Tr. 59-61, 86.) The plaintiff's application was denied initially on August 26, 2002, and upon reconsideration on October 22, 2002. (Tr. 328-31, 334-35.) A hearing was held before Administrative Law Judge ("ALJ") Robert C. Haynes on May 24, 2004. (Tr. 493-522.) The ALJ delivered an unfavorable decision dated October 29, 2004 (Tr. 339-44), and the plaintiff requested a review of that decision before the Appeals Council. (363-68.) The Appeals Council remanded the case to the ALJ on July 9, 2005 (Tr. 350-52), instructing the ALJ to "[o]btain additional evidence concerning the [plaintiff's] mental impairment, [f]urther evaluate the [plaintiff's] mental impairment, [g]ive further consideration to the [plaintiff's] maximum residual functional capacity, [and] [o]btain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the [plaintiff's] occupational base." (Tr. 351.)

A second hearing was held before ALJ Haynes on October 5, 2005 (Tr. 523-65), and he delivered an unfavorable decision on January 27, 2006.[2] (Tr. 20-28.) The Appeals Council denied the plaintiff's request for review of that decision on July 20, 2006 (Tr. 11-13), and the ALJ's decision became the final decision of the Commissioner.

_____

[2] The ALJ's decision is date stamped January 27, 2005, but this is a clerical error since the plaintiff's hearing in front of the ALJ occurred on October 5, 2005, and the Notice of Appeals Council Action indicates that the ALJ's decision was dated January 27, 2006. (Tr. 11, 28.)

Case 3:06-cv-00918   Document 29   Filed 12/04/09   Page 2 of 45 PageID #: 182

## II.  BACKGROUND

The plaintiff was born on January 27, 1974, and was 28 years old as of January 29, 2002, his alleged onset date. (Tr. 59.)  His highest level of education is less than a year of college. (Tr. 92.)  The plaintiff's past jobs include work in retail, tech-support, and health services. (Tr. 87.)

### A.  Chronological Background: Procedural Developments and Medical Records[3]

On September 12, 2001, the plaintiff presented to Ms. Pamela Hiers at the Volunteer Behavioral Health Care System ("VBHCS") with complaints of leg and back pain, mild depression, hypersomnia, and low self-esteem. (Tr. 172.)  He previously had been prescribed Depakote,[4] Neurotin,[5] Zyprexa,[6] Vioxx,[7] "[H]ydracodeine," and Lodine.[8] (Tr. 173.)  Ms. Hiers determined that the plaintiff had normal and soft speech, looked appropriate, and displayed good concentration, but was depressed. (Tr. 174.)  Ms. Hiers diagnosed the plaintiff with bipolar disorder, not otherwise specified, arthritis, and back pain from his L5-S1 fusion. (Tr 173.)

---

[3] Every attempt to decipher the medical evidence of the record was undertaken; however, several handwritten and photocopied sections were simply illegible.

[4] Depakote is used to treat "manic episodes of bipolar disorder." Saunders Pharmaceutical Word Book 210 (2009) ("Saunders").

[5] Neurontin is used as an "anticonvulsant for partial-onset seizures." Saunders at 488.

[6] Zyprexa is a "novel (atypical) antipsychotic for schizophrenia and manic episodes of a bipolar disorder." Saunders at 782.

[7] Vioxx is a "nonsteroidal anti-inflammatory drug (NSAID) for osteoarthritis, rheumatoid arthritis, and primary dysmenorrhea." Saunders at 756.

[8] Lodine is an "analgesic; nonsteroidal anti-inflammatory drug (NSAID) for osteoarthritis, rheumatoid arthritis, juvenile rheumatoid arthritis, and other chronic pain." Saunders at 412.

3

On November 15, 2001, and January 11, 2002, the plaintiff presented to Ms. Deborah Hinkle, a physician's assistant, for a mental health examination. (Tr. 236-41.) Ms. Hinkle determined that the plaintiff exhibited evidence of psychomotor retardation and increased depressive symptoms, but he denied "suicidal ideation or intent." (Tr. 241.) She found the plaintiff's speech to be logical and his thought process normal, but opined that his memory and orientation were mildly impaired. (Tr. 237, 240.) Ms. Hinkle diagnosed the plaintiff with bipolar disorder and arthritis, and she assigned him a Global Assessment of Functioning ("GAF") score of 55.[9] (Tr. 238, 241.)

On January 29, 2002, the plaintiff was admitted to the Middle Tennessee Mental Health Institute ("MTMHI") with complaints of worsening depression and suicidal ideation. (Tr. 122-28.) The plaintiff contemplated killing himself by either running his car into a tree or overdosing on drugs. (Tr. 122.) The plaintiff related that he was depressed and isolative, had difficulty sleeping, had a poor appetite, had no energy, lost 20 pounds in one month, and felt worthless, helpless, and hopeless. *Id.* The plaintiff also indicated that he "experience[d] occasional manic symptoms with associated feelings of elation and grandiosity, increased talkativeness, excessive energy, decreased need for sleep, and occasional impulsive behavior such as spending sprees." *Id.* Dr. Felix Adetunji, an examining psychiatrist, opined that the plaintiff suffered from psychomotor retardation and was preoccupied with feelings of self-guilt. (Tr. 124.) Furthermore, the plaintiff's speech was soft and slow, and his thought process was logical and goal directed, and focused on self-harm and worsening depression, but he had not experienced any auditory or visual hallucinations. (Tr. 123.)

---

[9] The GAF scale is used to assess the social, occupational, and psychological functioning of adults. Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) ("DSM-IV-TR"). A GAF score between 51 and 60 falls within the range of "[m]oderate symptoms [or] moderate difficulty in social, occupational, or school functioning." DSM-IV-TR at 34.

4

Dr. Adetunji diagnosed the plaintiff with bipolar I disorder, chronic pain, arthritis, asthma, and assigned him a GAF score of 31.[10] (Tr. 124.)

On January 30, 2001, the plaintiff denied having homicidal or suicidal ideation and did not exhibit any "suicidal gestures." (Tr. 120-21.) Dr. Adetunji adjusted the plaintiff's medication for depression and he "showed positive interaction with others." (Tr. 121.) Further, the plaintiff's psychomotor retardation, appetite, and ability to sleep all improved. *Id.* On February 1, 2002, the plaintiff was discharged from MTMHI and Dr. Adetunji assigned the plaintiff a GAF score of 65.[11] (Tr. 118, 121.)

From February 7, 2002, through February 14, 2002, the plaintiff was evaluated by Ms. Hinkle three times. (Tr. 227-35.) On February 7, 2002, and February 11, 2002, she opined that the plaintiff's speech was slow, his memory and orientation were mildly impaired, and he did not have suicidal or violent ideation, but he did have supportive and interpersonal psychotherapy issues. (Tr. 228, 234.) Ms. Hinkle diagnosed the plaintiff with bipolar disorder and assigned him a GAF score of 55. (Tr. 229, 232, 235.) She noted that the plaintiff was "clearly manic" on February 11, 2002. (Tr. 231.)

On February 28, 2002, the plaintiff presented to Dr. Patricia Williams, a psychiatrist at VBHCS, for a follow-up psychiatric evaluation. (Tr. 169-70.) The plaintiff denied having suicidal ideation, but was concerned with his continued rapid cycling between mania and depression.

---

[10] A GAF score between 31 and 40 falls within the range of "[s]ome impairment in reality testing or communication [or] major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." DSM-IV-TR at 34.

[11] A GAF score between 61 and 70 falls within the range of "[s]ome mild symptoms [or] some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV-TR at 34.

5

(Tr. 169.) Dr. Williams diagnosed the plaintiff with bipolar disorder, not otherwise specified, and arthritis, and he assigned the plaintiff a GAF score of 65. (Tr. 170.) Dr. Williams increased the plaintiff's dosage of Zyprexa and recommended that he continue with industrial organizational psychology ("IOP") sessions. *Id.*

On March 19, 2002, the plaintiff was taken to the emergency room and Dr. Chuck Seamens diagnosed him with headaches and depression. (Tr. 160.) Dr. Seamens noted that although the plaintiff was complaining of being depressed, he did not have suicidal ideation. *Id.* Dr. Seamens also requested that a psychiatric nurse evaluate the plaintiff. *Id.*

On March 20, 2002, the plaintiff was admitted to the Psychiatric Hospital at Vanderbilt University and examined by Dr. Stephen Montgomery. (Tr. 137-59.) The plaintiff explained that he had been depressed for over two weeks and although he denied having suicidal ideation at intake, he admitted that over the two previous days he had suicidal ideation with a specific plan to overdose on drugs. (Tr. 137-38.) The plaintiff reported that he had "decreased" sleep, concentration, and interest; gained 40 pounds due to an increased appetite; had low energy; and had daily feelings of worthlessness. (Tr. 138.) Additionally, the plaintiff related that he experienced panic attacks "two or three times a week with symptoms of chest tightness, chest pain, [and] fear of dying, lasting approximately five minutes to two hours." *Id.* Dr. Montgomery found that the plaintiff's speech was "decreased in amount;" his motor function had no abnormalities; his affect was "constricted and depressed;" he had no auditory or visual hallucinations, or flight of ideas; and he exhibited fair judgment and insight. *Id.* When he was admitted to the hospital, Dr. Montgomery diagnosed the

6

plaintiff with "[b]ipolar I disorder[12], most recent episode depressed, severe, without psychotic features; panic disorder without agoraphobia;" asthma; and arthritis. (Tr. 137.) He also assigned the plaintiff a GAF score of 35. *Id.*

The medication provided to the plaintiff during his hospitalization gradually improved his mood and decreased his suicidal ideation. (Tr. 139.) The plaintiff became less isolated and interacted socially with peers, which was demonstrated by his playing the guitar for others, leading patients in Bible study and devotion, and participation in group sessions. *Id.* Although the plaintiff had difficulty sleeping during his stay at the hospital, on March 23, 2002, he was able to sleep after taking Trazodone.[13] (Tr.143, 145-48.) Despite the plaintiff's reporting an increased appetite when he was admitted, nursing assessments indicated that his appetite was "poor" or "not good." (Tr. 146-48.) Upon discharge on March 28, 2002, Dr. Montgomery diagnosed the plaintiff with "[b]ipolar I disorder, most recent episode depressed, in partial remission[;] [p]anic disorder without agoraphobia;" arthritis, asthma, increased heart rate, and headaches. (Tr. 140.) He also assigned the plaintiff a GAF score of 40. *Id.* Dr. Montgomery recommended that the plaintiff follow-up with the VBHCS intensive outpatient program. *Id.*

On May 2, 2002, Dr. Williams evaluated the status of the plaintiff's mental condition. (Tr. 223-26.) The plaintiff complained of depression, apathy, and "some" suicidal ideation. (Tr. 224.) The plaintiff exhibited "few symptoms" related to mania, but he had "[l]ittle energy or

---

[12] According to WebMD, the difference between Bipolar I disorder and Bipolar II disorder is that people with Bipolar I disorder experience true mania, but people with Bipolar II disorder have an elevated mood that never reaches full mania. This less severe mania is called hypomania.

[13] Trazodone is a "serotonin uptake inhibitor" that is used to control aggressive behavior, alcoholism, panic disorder, agoraphobia, and cocaine withdrawal." Saunders at 716.

7

motivation to get up and do things." *Id.* Dr. Williams classified the plaintiff's depressed mood and racing thoughts as moderate, and his affect as subdued. *Id.* Dr. Williams opined that the plaintiff's speech was logical and his thoughts, memory, and orientation were normal. (Tr. 225.) She diagnosed the plaintiff with bipolar disorder, not otherwise specified, and assigned him a GAF score of 65. *Id.*

Ms. Hiers examined the plaintiff four times between May 10, 2002, and June 10, 2002. (Tr. 218-22.) She opined that he exhibited a depressed mood based on his "low voice tone, hypersomnia, and physical pain." (Tr. 220.) The plaintiff reported that his depression was a 7.5 out of 10. *Id.* On May 16, 2002, the plaintiff related that his father likely needed surgery for back problems and that he would perform the family chores while his father recuperated. (Tr. 222.) On May 30, 2002, the plaintiff stated that he either has "100% involvement with friends or nothing" and that "he cannot explain why he does this." (Tr. 218.) On June 10, 2002, the plaintiff stated that he was interested in contacting a community theater because "he missed the comraderie [sic] he once shared with theater members [and] he could make a little money." (Tr. 219.) Although the plaintiff did not "show interest in obtaining employment," he reported that "he could work tomorrow in the EMT field." *Id.*

On July 20, 2002, the plaintiff was examined by Tennessee Disability Determination Services ("DDS") psychologist Dr. Andrew Phay, Ph.D., (Tr. 175-80) and he opined that although the plaintiff displayed "[n]o significant evidence of malingering, denial, inconsistency or lack of effort . . . [Dr. Phay] did have a clinical impression that this individual may be exaggerating either the severity of his symptoms or their impact on his ability to function." (Tr. 175.) The plaintiff related that he "becomes very energetic," gets minimal amounts of sleep, "may redo his entire room"

8

which can last from half of a day to two days, talks nonstop, and goes on spending sprees 10 to 12 times a year. (Tr. 177.) He also stated that his medication "does help." *Id.* The plaintiff reported that he was "a little depressed," suffered from a loss of appetite, had poor energy levels and feelings of worthlessness, and was an insomniac when off of his medication. (Tr. 177-78.) The plaintiff related that he does not perform chores around the house and has difficulty completing tasks, but he is able to drive, use a radio and television, write letters and checks, and read. (Tr. 178.) Dr. Phay observed that the plaintiff's orientation, hygiene, speech, concentration, and motor behavior were all unremarkable. (Tr. 175-76.) He determined that the plaintiff could understand and remember, was able to appropriately and socially interact, and could sustain concentration and persistence, but his ability to adapt to a normal work environment was "somewhat impaired." (Tr. 179.) Dr. Phay diagnosed the plaintiff with "[b]ipolar II disorder, mixed rapid cycl[ing]" and panic disorder that was partially controlled by medication. *Id.*

Ms. Hiers evaluated the plaintiff's mental health five times between August 2, 2002, and September 19, 2002. (Tr. 213-17.) The plaintiff related that he was actively pursuing employment, but believed that his mental impairment hindered his ability to find a job. (Tr. 217.) He also stated that he was not eating well and "was forgetting dates [and] had noticed his memory slipping." *Id.* On August 12, 2002, the plaintiff reported that his desire to obtain a job was "now on hold" and that he does not want to make the commitment needed to retain employment. (Tr. 216.) The plaintiff returned to Ms. Hiers on August 29, 2002, and related that, over the last week, he had repaired computers for money and he asked to come in "for weekly sessions for a while due to his current depressive emotional state." (Tr. 215.) During the plaintiff's next two sessions with Ms. Hiers, he focused on relating the difficulty he was having with his personal relationships. (Tr. 214-15.)

9

On August 7, 2002, the plaintiff presented to DDS physician Dr. Ramsey Walker with complaints of lower back pain. (Tr. 181-85.) Dr. Walker opined that the plaintiff had significant range of motion limitations in his lower lumbar spine and chronic lumbar pain. (Tr. 184.) Dr. Walker noted that the plaintiff had a history of "bipolar disease" but that he denied "any suicidal or homicidal thoughts at this time." *Id.* On the same day, DDS physician Dr. William Regan completed a mental residual functional capacity ("RFC") assessment of the plaintiff (Tr. 200-02), and found that he was markedly limited in his ability "to understand and remember detailed instructions, to carry out detailed instructions, [and] to interact appropriately with the general public." (Tr. 200-01.) Dr. Regan also determined that the plaintiff was moderately limited in his ability "to maintain attention and concentration for extended periods, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, [and] to respond appropriately to changes in the work setting." *Id.* Dr. Regan opined that the plaintiff could perform simple tasks, but could not perform detailed tasks or interact with the public. (Tr. 202.)

On August 8, 2008, Dr. Regan completed a psychiatric review technique form ("PRTF") on the plaintiff's affective, anxiety, and personality disorders. (Tr. 186-99.) He opined that the plaintiff suffered from bipolar II disorder, panic attacks, and a personality disorder, not otherwise specified, but that none of the impairments precisely satisfied the diagnostic criteria provided in the Listings of Impairments. (Tr. 189, 191, 193.) Dr. Regan concluded that the plaintiff's activities of daily living and difficulties in maintaining social functioning were mildly restricted, and his difficulties in maintaining concentration, persistence, or pace were moderately restricted. (Tr. 196.) He also found that the plaintiff had one or two episodes of decompensation of extended duration. *Id.*

On August 15, 2002, Dr. Louise Patikas completed a physical RFC on the plaintiff (Tr. 204-11) and she opined that the plaintiff was capable of lifting 50 pounds occasionally and 25 pounds frequently, and could stand/walk or sit for about six hours in an eight hour workday. (Tr. 205.) Dr. Patikas determined that the plaintiff could frequently climb, balance, stoop, kneel, crouch, and crawl and that he had no manipulative, visual, communicative, or environmental limitations. (Tr. 207-08.)

On October 16, 2002, Dr. Larry Welch, Ed.D., completed a PRTF on the plaintiff's affective, anxiety, and personality disorders. (Tr. 242-55.) Dr. Welch opined that the plaintiff suffered from "[b]ipolar disorder, in partial remission, [p]anic [d]isorder without [a]goraphobia in partial remission, [and] a [p]ersonality [d]isorder, NOS [not otherwise specified]." (Tr. 245, 247, 249.) Dr. Welch noted that none of the plaintiff's disorders "precisely satisf[ied] the diagnostic criteria" established in the Listings. *Id.* Dr. Welch concluded that the plaintiff's activities of daily living were mildly restricted, and that his difficulties in maintaining social functioning, concentration, persistence, and pace were moderately limited. (Tr. 252.) He also found that the plaintiff had one or two episodes of decompensation of extended duration. *Id.* Dr. Welch further opined that there was no evidence to support a finding that the plaintiff satisfied the "C" criteria of the Listings.[14] (Tr. 253.)

On November 9, 2002, the plaintiff was evaluated at Vanderbilt University Medical Center's Psychiatric Hospital for complaints of suicidal ideation. (Tr. 271-76.) The plaintiff's sleep and energy were "ok," his appetite was "fair," and he suffered from mood swings. (Tr. 271.) Although

---

[14] Dr. Welch concluded that although the plaintiff's impairments were "[s]erious," those impairments fell "short of the listings." (Tr. 254.)

he was depressed, the plaintiff was not hallucinating and his motor activity was "relaxed." (Tr. 274.) The plaintiff was diagnosed with bipolar disorder, panic disorder, arthritis, asthma, and migraines. (Tr. 275.)

On December 4, 2002, the plaintiff was admitted to the psychiatric hospital at Vanderbilt after overdosing on Atenolol.[15] (Tr. 259-62.) Dr. Montgomery found that the plaintiff weighed less than he had at his last hospitalization, had fair hygiene, had no abnormalities in motor functions, and his speech was decreased in amount and volume. (Tr. 260.) The plaintiff reported that he did not have suicidal or homicidal ideation, or auditory or visual hallucinations. *Id.* Upon his admission, Dr. Montgomery diagnosed the plaintiff with "[b]ipolar I disorder, most recent episode depressed" and "[p]anic disorder without agoraphobia," and assigned the plaintiff a GAF score of 40. (Tr. 259.) During his treatment the plaintiff gradually improved, interacted socially with his peers, and displayed "entirely appropriate" behavior. (Tr. 261.) On December 10, 2002, Dr. Montgomery discharged the plaintiff and noted that his speech had regular rate and rhythm, he displayed no motor function abnormalities, and he did not have suicidal or homicidal ideation. *Id.* Dr. Montgomery assigned him a GAF score of 60. *Id.* Dr. Montgomery also recommended that the plaintiff remain on his medication because his discontinuation of his medicine "largely contributed to the decline in his mood." (Tr. 262.)

On January 7, 2003, Dr. Luis Portilla examined the plaintiff for complaints of asthma and found that the plaintiff did not have any wheezing, but he did increase the plaintiff's dosage of Advair. (Tr. 320.) On January 28, 2003, Jeffrey Viers, a licensed psychological examiner,

---

[15] Atenolol is "a cardioselective [] blocking agent used in the treatment of hypertension and chronic angina pectoris." Dorland's Illustrated Medical Dictionary 172 (30th ed. 2003) ("Dorland's").

performed a psychological evaluation on the plaintiff (Tr. 263-70), and the plaintiff reported that he suffered from mood swings with symptoms including insomnia, panic attacks, poor concentration, depression, feelings of worthlessness, energy fluctuations, racing thoughts, and fast speech. (Tr. 265.) Mr. Viers opined that the plaintiff had good hygiene, and no problems with his short term memory, long term memory, or concentration. (Tr. 266.) The plaintiff's verbal I.Q. score was 107, performance I.Q. score was 100, and full scale I.Q. score was 104. (Tr. 266-67.) Mr. Viers determined that the plaintiff had "significant emotional distress" and difficulty dealing with stress, was withdrawn socially, and believed that he did not have much control over his mood or medical problems. (Tr. 268.) Mr. Viers assigned the plaintiff a GAF score of 55 and diagnosed him with bipolar disorder, "not otherwise specified by history," and dependent personality features. (Tr. 269.)

On May 21, 2003, Dr. Williams conducted a follow-up evaluation of the plaintiff after his hospitalization for attempting to overdose on Atenolol. (Tr. 279-81.) The plaintiff related that he had stopped taking his medication for approximately a month and a half and that this triggered "mood swings cycling both up and down." (Tr. 281.) He denied having any suicidal or homicidal ideation. *Id.* Dr. Williams examined the plaintiff again on June 18, 2003, and the plaintiff reported that he was "doing better" on his medications. (Tr. 279.) Dr. Williams diagnosed the plaintiff with bipolar disorder, not otherwise specified. (Tr. 280.)

An MRI conducted on June 25, 2003, showed that the plaintiff's lumbar vertebrae were normal in height and alignment and he had a "[m]ild posterior disc bulge at the L1-2 level" and a "[m]inimal posterior annular bulge at the L4-5 level." (Tr. 321.) On October 23, 2003, Ms. Hiers assessed the plaintiff's progress in school and his mental stability. (Tr. 285.) The plaintiff related that he was taking classes at Middle Tennessee State University ("MTSU") and had changed his

13

major to computer engineering. *Id.* Although MTSU accommodated the plaintiff's dyslexia[16] by providing him with supplemental materials, he complained that he felt isolated and that he mainly remained in his bedroom with "comfort items and studies." *Id.*

Dr. Tina Gresham, a cardiologist, examined the plaintiff on November 18, 2003, after he complained of palpitations and tachycardia. (Tr. 283-84.) Dr. Gresham discontinued the plaintiff's use of Cardizem,[17] prescribed Sectral,[18] and advised him to continue taking his bipolar medication.[19] (Tr. 284.) On December 4, 2003, the plaintiff presented to Dr. Richard Hoos for a neurological examination. (Tr. 303-04.) An MRI on the plaintiff revealed mild degenerative changes and some foraminal narrowing, but no definite impingement. (Tr. 304.) Dr. Hoos concluded that the plaintiff's objective evaluation was "normal" and his MRI was "unimpressive." *Id.* On December 12, 2003, the plaintiff was admitted to St. Thomas Hospital after collapsing. (Tr. 286-302.) The plaintiff was diagnosed with "[u]nexplained syncope."[20] (Tr. 291.) On January 12, 2004, Dr. Gresham determined that the plaintiff had neurogenic syncope and that Atenolol, Sectral, and Cardizem were

---

[16] The plaintiff reported to Dr. Phay on July 20, 2002, and to Mr. Viers on January 28, 2003, that he had been diagnosed with dyslexia in eleventh grade (Tr. 176, 264), but he explained to Mr. Viers that "no intervention was provided because he had already learned to adapt to his learning difficulties." (Tr. 264.)

[17] Cardizem is a "calcium channel blocker for atrial fibrillation or paroxysmal supraventriuclar tachycardia." Saunders at 133.

[18] Sectral is an "antiarrhythmic for premature ventricular contractions." Saunders at 635.

[19] The plaintiff was taking Depakote, Trazodone, and Remeron for his bipolar disorder. (Tr. 283.)

[20] Syncope is the "temporary suspension of consciousness due to generalized cerebral ischemia." Dorland's at 1807.

not effective in controlling his symptoms. (Tr. 301.)  Dr. Gresham suggested that the plaintiff try another "beta blockade with Toprol XL."[21] *Id.*

Dr. Williams completed a Medical Source Statement of Ability to do Work-Related Activities (Mental) on April 27, 2004. (Tr. 474-75.)  She opined that the plaintiff's ability to "[u]nderstand and remember short, simple instructions" was not limited; to "[c]arry out short, simple instructions" was slightly limited; and to understand, remember, and carry out detailed instructions, and make judgments on "simple work related decisions" was moderately limited. (Tr. 474.) Dr. Williams noted that the plaintiff had slight limitations in his ability to interact appropriately with the public and with co-workers, and moderate limitations with his ability to interact appropriately with supervisors, to respond appropriately to work pressures, and to changes in routine work settings. *Id.*  Dr. Williams stated that the plaintiff's "[b]ipolar illness when in depressed or manic phase can lead to grandiosity and inability to work with [his] supervisor." (Tr. 475.)

### B.  Hearing Testimony from May 24, 2004: The Plaintiff and Vocational Expert

The plaintiff's first hearing in this case was held on May 24, 2004, before ALJ Robert C. Haynes. (Tr. 493-522.)  The plaintiff was represented by an attorney, and the plaintiff and a Vocational Expert ("VE") testified at the hearing. (Tr. 494.)

The plaintiff testified that he has a high school diploma and had worked as a licensed EMT until he quit because of a "back condition." (Tr. 497-98.)  The plaintiff testified that he had been admitted to MTMHI in 2001 because he had a difficult time with his divorce and that he was

---

[21] According to WebMD, Toprol XL is a beta-blocker that is used to treat chest pain, heart failure, and hypertension.

15

prescribed medication. (Tr. 498-99.) The plaintiff related that after he was discharged, he attended intensive group therapy sessions that helped him to monitor his medication and learn coping skills. (Tr. 499.) The plaintiff stated that he had been admitted to the hospital several times for suicidal ideation and on two occasions, he attempted suicide by overdosing on Atenolol. *Id.* The plaintiff testified that he has had asthma his entire life and he almost died from it when he was six months old, and that he has developed osteoarthritis in nearly all of his joints. (Tr. 500.) The plaintiff also testified that he was diagnosed with a bipolar disorder in December of 1991 (Tr. 508), and was diagnosed with neurogenic syncope in December of 2003. (Tr. 509)

The plaintiff testified that he began work at Portamedic in either January or February of 2003, but he was injured in a car accident in April of 2003, and that exacerbated his back problems. *Id.* The plaintiff lost his job after the accident because he "was unable to maintain an open work schedule." *Id.* The plaintiff related that he then tried to work at a deli, but after working there for a month and a half he began having heart problems, which were diagnosed as neurogenic syncope. *Id.* The plaintiff stated that his heart problems and bipolar disorder will continue for the rest of his life. (Tr. 511.)

The plaintiff testified that arthritis causes him to have "good days and bad days." (Tr. 502.) He explained that on his good days he is able to move around normally without using a cane, but that on bad days he is not able to get out of bed and has to lie in bed until the pain goes away. *Id.* The plaintiff related that he was a student at MTSU in 2003, but had to withdraw from school after being hospitalized with heart problems. (Tr. 502-03.) He testified that his doctors would not let him return to school until they were able to get "everything regulated." (Tr. 503.)

The plaintiff related that his bipolar disorder caused him to have "general mood swings," and made it difficult for him to deal "with certain issues . . . [and] certain ways of doing things." *Id.* The plaintiff testified that he has had treatment for his bipolar disorder since November of 2000, and that Dr. Williams, a psychiatrist, first examined him in 2001. (Tr. 504.) He stated that he takes Depakote, Trazodone, Neurontin, and Xanax[22] to treat his bipolar disorder, and that he has lost approximately 50 or 55 pounds in the past "year or two" as a result of this condition. *Id.*

The plaintiff testified that he would like to work "every day of a work week or work month," but he cannot predict how he is going to feel. (Tr. 505.) He testified that he lost his job at Dell in 2001, because he used up all of his vacation and sick days over a four month period. (Tr. 510-11.) He explained that at his last job, he missed four or five days in a month and a half, and at his current job as an inventory specialist he had missed two weeks in the last "month or so" due to back problems. (Tr. 506.) The plaintiff related that the reason why he changed jobs so frequently is because he either gets bored with a job, or he has a conflict with his supervisor or co-workers. (Tr. 507.) The plaintiff attributed his inability to maintain employment to his "bipolar or other medical conditions." (Tr. 510.)

The VE, Dr. Gordon Doss, testified that the plaintiff's past jobs as a security guard, cashier, office manager, and retail manager are classified as light and semi-skilled. (Tr. 513.) He then classified the plaintiff's past work as an engraver and technical support representative as being sedentary and skilled, and his work as an account manager as being medium and semi-skilled. *Id.* The VE testified that a person with back impairments who could lift up to 20 pounds and 10 pounds frequently, and could sit or stand for six hours in an eight hour period would be able to perform "the

---

[22] Xanax is used to treat panic disorders and agoraphobia. Saunders at 768.

full range of light and sedentary work." (Tr. 514.)  He stated that if the person could lift up to 50 pounds and 25 pounds frequently, stand or walk for six hours out of eight hours, and could frequently perform postural activities, as provided in Dr. Patikas' August 15, 2002, assessment, he could perform a full range of light, medium, and sedentary work. (Tr. 515-16.)  The VE testified that if the plaintiff had those limitations, he would be able to perform his past relevant work. *Id.*

The ALJ asked the VE how pain would affect a person's ability to function. (Tr. 515.)  He answered that a person's level of pain is measured by one of four categories: mild to moderate, moderate to severe, and severe.[23] *Id.*  The VE concluded that a person who had only mild or moderate pain would not have any significant interference with his ability to function, even if the pain were continuous. *Id.*  However, the VE stated that if the person's pain were persistently moderate to severe or severe, he would have difficulty concentrating and working full time.  *Id.*

In focusing on non-exertional impairments, the VE testified that a person with marked limitations in his ability to understand, remember, and carry out detailed instructions, and in interacting appropriately with the public should not be working as a cashier or as a technical support staff member. (Tr. 516-17.)  The VE concluded that such limitations foreclosed work in any of the plaintiff's other past employment. (Tr. 517.)  However, he also stated that a person with the limitations set forth in Dr. Regan's August 7, 2002, evaluation would be able to work as a sitter for a bedridden person in either a hospital or a nursing home, as file clerk, or as an entry level security guard.  (Tr. 517-18.)

---

[23] Although the VE testified that there were four categories, the transcript reflects that he described only three categories.

The VE testified that a person with a GAF score of 50 or below would not be able to maintain "a simple job," but that a person with a GAF score of 51 or better could perform work on a full time basis. (Tr. 518-19.)  He related that a person with a GAF score between 55 and 65 could perform jobs classified as unskilled or semi-skilled. (Tr. 519.)  The VE testified that although it depends on the specific job and employer, generally a person can miss three and a half or four days of work in a month.[24] (Tr. 519-20.)  He explained that if a person were to miss more than three and a half to four days a month, he would have difficulty maintaining full time employment. (Tr. 520.)

### C.  Hearing testimony October 5, 2005: The Plaintiff, The Plaintiff's Mother, and Vocational Expert

The plaintiff's second hearing was held on October 5, 2005, before ALJ Haynes. (Tr. 523-65.)  The plaintiff was represented by an attorney, and the plaintiff, the plaintiff's mother, and a VE testified at the hearing. (Tr. 523.)

The plaintiff testified that finding his deceased grandfather's body at the age of 15 led to his first hospitalization, at which time he was diagnosed with bipolar disorder. (Tr. 530.)  He related that after being discharged from the hospital, he moved to Tennessee to live with his father and began working at Sears and JCPenney. (Tr. 531.)  The plaintiff stated that he left Sears after getting into a disagreement with his supervisor and he left JCPenney due to "cutbacks." *Id.*

After his daughter was born, the plaintiff and his ex-wife moved to Ohio. (Tr. 532.)  The plaintiff testified that he worked at Central Locating Services, an underground utilities company, "for four or five months," but left the job because the company had engaged in business practices

---

[24] The Court seriously questions the VE's testimony that a newly hired employee could be absent from work three to four days a month on a regular basis and still retain his job.

19

that he thought were unethical. *Id.* The plaintiff related that he worked for another utility company for approximately two months, and then for Rainbow Rentals, where he suffered a back injury that required surgery. *Id.* The plaintiff testified that in Ohio he also worked at Papa Johns and at a car dealership and completed EMT training. *Id.* He stated that he left the car dealership because he felt underpaid for the work he performed. (Tr. 533-34.) The plaintiff testified that he worked for another utility company for four or five months and left after getting "burned out;" for CompUSA as a security guard and as an inventory control coordinator, but left after a disagreement with his supervisor; for Portamedic as a field examiner and office manager for approximately a year, but left after he had a head injury since he was "unable to take care of [himself];" and for Dell Computers, after he moved back to Tennessee, for seven or eight months, but left because he "couldn't handle the stress [or] the workload." (Tr. 534-35.) The plaintiff's next two jobs were at Things Remembered and TJ Maxx. (Tr. 535.) The plaintiff related that he left Things Remembered because he "made more money" at TJ Maxx, and he then left TJ Maxx due to his hospitalization at MTMHI. *Id.*

The plaintiff testified that he was hospitalized on four different occasions in 2002, and that in March of 2003, he was in a car accident and injured two discs in his back. *Id.* He stated that after the accident, he attended MTSU in the fall of 2003, but he could not complete his course work due to heart problems. (Tr. 535-36.) The plaintiff explained that after being diagnosed with syncope, he was not allowed to return to MTSU for the spring semester because his cardiologist "really didn't want [him] driving." (Tr. 536.)

The plaintiff testified that at the end of 2004 he worked for a friend's computer company for four to five months, but he left when he "could not draw any money off the company." (Tr. 536-37.)

20

The plaintiff related that he then went to work full time at Swanson Christian Products, but left after having to deal "with unrealistic goals and expectations." (Tr. 537.) He stated that, at the time of this hearing, he was performing freelance computer work for his friend's computer company, but that he could only work 15 or 20 days per month. (Tr. 538.) However, the plaintiff also testified that, of the 20 work days a month, he would not be able to work seven to ten days. *Id.*

The plaintiff testified that his asthma "severely limits" his activities with his daughter, and his bipolar disorder exacerbates his asthma, migraines, and heart problems. (Tr. 538-39.) He explained that there are days when he does not get dressed or leave his home, and that during the months immediately preceding this hearing, he only left his home five out of seven days because he did not want to be around people. (Tr. 539-40.) The plaintiff related that he has lived with his mother and father since 2000, and that he is able to drive but does not do any housework. (Tr. 541-43.)

The plaintiff's mother testified that, during the plaintiff's senior year of high school, she received a telephone call from his school counselor because "he was thinking about killing himself." (Tr. 547.) Subsequently, the plaintiff was admitted to the Fox Adolescent Psychiatric Unit and diagnosed with bipolar disorder. *Id.* The plaintiff's mother related that after he separated from his wife, he had a breakdown and was hospitalized in Columbus, Ohio. (Tr. 549.) She explained that the plaintiff moved in with her and his father after leaving the hospital, but that he does not do "very much" around the house. *Id.* She stated that when the plaintiff is "down," he will not get dressed or leave his room. (Tr. 550.) The plaintiff's mother testified that she has noticed a pattern regarding his employment:

> when he gets one [a job] it's, we all get excited, because I think, well, maybe, you
> know, it's going to be fine, and that lasts sometimes for a couple of weeks,

21

sometimes for a month or so, sometimes, a little bit longer. And things start not being quite like what he thinks they're going to be, and he ends up not feeling well, and not going to work, or something happens there, and there's, he loses that job.

*Id.* She also explained that she believed that this pattern will continue and that she will have to support the plaintiff for the rest of her life. (Tr. 551.)

Dr. Gary Sturgill, the VE, testified that he agreed with the VE at the plaintiff's first hearing that all of the plaintiff's previous jobs would be classified as light and range from unskilled to skilled. (Tr. 555.) The VE opined that if the plaintiff did not suffer from bipolar disorder he would be able to engage in all of his previous work related activities and that his asthma would not preclude him from performing his past relevant work. (Tr. 555-56.) The ALJ asked the VE to consider the moderate functional limitations set forth in Dr. Williams' Medical Source Statement of Ability to do Work-Related Activities and he concluded that the plaintiff would be precluded from "any skilled work" and could only perform his past job as an engraver. (Tr. 557.)

The ALJ then asked the VE to consider Dr. Phay's psychological evaluation indicating that the plaintiff is a person who is moderately limited in his ability to adapt. (Tr. 558.) The VE opined that such a restriction would preclude the plaintiff from "skilled work," but that the plaintiff would not be precluded from his remaining jobs. *Id.* The VE next considered Dr. Regan's PRTF, and testified that if the plaintiff were not able to perform detailed tasks or relate to the public, but could perform simple tasks and had no problems with supervisors or co-workers, he could only perform his past unskilled work as an engraver. (Tr. 558-59.) After reviewing Dr. Welch's PRTF, the VE testified that the plaintiff would be precluded from all his past relevant work except the unskilled

22

job as an engraver.[25] (Tr. 559.) The ALJ then asked the VE to review the findings of Mr. Viers's psychological evaluation of the plaintiff. (Tr. 560.) The VE concluded that limitations in Mr. Viers's evaluation would preclude the plaintiff from performing "semi-skilled and skilled work," but that he could perform unskilled work. *Id.*

The ALJ asked the VE to explain the plaintiff's vocational functioning based on his GAF scores. (Tr. 560-62.) The VE testified that a person who persistently has a GAF score at or below 50 would not be able to perform any work, and that if that individual had a GAF score in the moderate range, between 51 and 60, work is affected, but is not prohibited and that individual would be generally limited to unskilled work. (Tr. 561.) He also stated that a person with a GAF score above 60 would likely be able to perform any work ranging from unskilled to skilled. *Id.* Further, the VE testified that a person who misses more than three days of work in a month would likely lose his job, and that a person with the plaintiff's work history and medical conditions would "likely not [be] able to sustain [a job] over time." (Tr. 562-63.)

### III. THE ALJ'S FINDINGS

The ALJ issued an unfavorable decision on (Tr.17-19.) Based on the record the ALJ made the following findings. (Tr. 27-28.)

---

[25] When asking the VE to review "Exhibit 19F" (Tr. 401-409), the ALJ noted that the limitations in that document "sound[] awfully similar to the other, earlier DDS [report]." (Tr. 559.) Exhibit 19F, Dr. Regan's PRTF and mental RFC, is dated August 8, 2002, and Exhibit 6F (Tr. 186-203), Dr. Regan's PRTF and mental RFC, is also dated August 8, 2002. A few pages of exhibit 19F are missing from the record and are out of order, but it is clear that it is the same document as Exhibit 6F.

Case 3:06-cv-00918   Document 29   Filed 12/04/09   Page 23 of 45 PageID #: 203

1.  The claimant met the insured status requirements of the Act as of the date of this decision.

2.  The record is unclear whether the claimant has engaged in substantial gainful activity since the alleged onset date.

3.  The claimant has "severe" impairments, including bipolar disorder, asthma, and lumbar degenerative disc disease (post-op).

4.  The claimant's impairments, considered individually and in combination, do not meet or equal in severity any impairment set forth at 20 CFR Part 404, Subpart P, Appendix One.

5.  The claimant's subjective allegations of disabling pain and functional limitations are not credible.

6.  The claimant retains the residual functional capacity as described in the body of this decision.

7.  The claimant's past relevant work as engraver is not preluded by the residual functional capacity.

8.  The claimant has not been disabled within the meaning of the Act through the date of this decision.


## IV.  DISCUSSION

### A.  Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching his conclusion. 42 U.S.C. § 405(g). *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases). The Commissioner's decision must be affirmed if it is supported by substantial evidence, even if the evidence could also support another conclusion. *Her v. Comm'r of Soc. Sec.,*

203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*). A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must show that he is not engaged in "substantial gainful activity" at the time he seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b) and 416.920(b)). A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Case 3:06-cv-00918   Document 29   Filed 12/04/09   Page 25 of 45 PageID #: 205

Second, the plaintiff must show that he suffers from a "severe impairment." A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.* (citing 20 C.F.R. §§ 404.1520(c) and 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b). The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment in Appendix 1 of 20 C.F.R. Part 404, Subpart P of the regulations, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. *Id.* (citing 20 C.F.R. §§ 404.1520(d) and 416.920(d)). The plaintiff may establish that he meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

26

Fourth, if the plaintiff's impairment does not prevent him from doing his past relevant work, he is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant work, or proving that a particular past job should not be considered relevant. *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, he must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that he is unable to perform his prior relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in the national economy. *See, e.g., Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S. Ct. 2428, 77 L.Ed.2d 1315 (1983) (upholding the validity of the medical-vocational guidelines "grid" as a means for the Commissioner of carrying his burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of his functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the plaintiff can perform, he is not disabled.[26] *Id. See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

---

[26] This latter factor is considered regardless of whether such work exists in the immediate area in which the plaintiff lives or whether a specific job vacancy exists or whether the plaintiff would be hired if she applied. *Ragan v. Finch*, 435 F.2d 239, 241 (6th Cir. 1970).

27

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

### B.  The Five-Step Inquiry

In this case, the ALJ resolved the plaintiff's case at step four of the five-step process, and ultimately determined that the plaintiff was not disabled as defined by the Act.  (Tr 28.)  At step one, the ALJ questioned whether the plaintiff had not engaged in substantial gainful activity since January 19, 2002, the alleged onset date of disability, but continued his analysis, assuming that he had not engaged in substantial gainful activity. (Tr. 27.)  At step two, the ALJ found that the plaintiff's bipolar disorder, asthma, and degenerative disc disease were severe impairments. *Id.*  At step three, the ALJ determined that the plaintiff's impairments, either singly or in combination, did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation 4. *Id.*  At step four, the ALJ concluded that the plaintiff was able to perform his past relevant work as an engraver. (Tr. 28.)

The effect of this decision was to preclude the plaintiff from DIB and SSI benefits and to find him not disabled, as defined in the Act, at any time after January 19, 2002, through the date of the decision.

### C.  Plaintiff's Assertions of Error

The plaintiff contends that the ALJ erred in finding that he did not meet the listing for affective disorders and took record evidence out of context, and that the Appeals Council and ALJ did not consider the full record. Docket Entry No. 14-1, at 9-10.   The plaintiff also contends that the ALJ erred in classifying his past work as an engraver as being unskilled and in determining that he could perform such work. *Id.*

### 1. The ALJ correctly determined that the plaintiff did not meet the listing for an affective disorder.

The plaintiff asserts that the ALJ erred by finding that he did not meet Listing 12.04 for an affective disorder, specifically bipolar disorder. Docket Entry No. 14, at 10-21.  He maintains that the record medical evidence demonstrates that he has satisfied the A, B, and C criteria under 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04.  *Id.*

As noted in *Little v. Astrue*, "'the burden of proof lies with the [plaintiff] at steps one through four of the [sequential disability benefits analysis],' including proving presumptive disability by meeting or exceeding a Medical Listing at step three." 2008 WL 3849937, at *4 (E.D.Ky. Aug. 15, 2008) (quoting *Her*, 203 F.3d at 391). Thus, the plaintiff "'bears the burden of proof at Step Three to demonstrate that he has or equals an impairment listed in 20 C.F.R. part 404, subpart P, appendix 1.'" *Little*, 2008 WL 3849937, at *4 (quoting *Arnold v. Comm'r of Soc. Sec.*, 238 F.3d 419 (table), 2000 WL 1909386, at *2 (6th Cir. Dec. 27, 2000)).  The plaintiff's impairment must meet all of the listing's specified medical criteria and "[a]n impairment that meets only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530-532, 110 S.Ct. 885, 107 L.Ed.2d 967(1990).  If the plaintiff does demonstrate that his impairment meets or equals a

29

listed impairment, then the ALJ "'must find the [plaintiff] disabled.'" *Little*, 2008 WL 3849937, at

*4 (quoting *Buress v. Sec'y of Health & Human Servs.*, 835 F.2d 139, 140 (6th Cir.1987)).

There is substantial evidence to support the ALJ's decision that the plaintiff did not meet

Listing 12.04 for an affective disorder. The Listing provides that affective disorders are

"characterized by a disturbance of mood, accompanied by a full or partial manic depressive

syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally

involves either depression or elation." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04. For the plaintiff

to be found disabled under Listing 12.04, he must satisfy the requirements in both subsections A and

B, or satisfy the requirements in subsection C, as follows:

> A. Medically documented persistence, either continuous or intermittent, of one of the
> following:
> > 1. Depressive syndrome characterized by at least four of the following:
> > > a. Anhedonia or pervasive loss of interest in almost all activities; or
> > > b. Appetite disturbance with change in weight; or
> > > c. Sleep disturbance; or
> > > d. Psychomotor agitation or retardation; or
> > > e. Decreased energy; or
> > > f. Feelings of guilt or worthlessness; or
> > > g. Difficulty concentrating or thinking; or
> > > h. Thoughts of suicide; or
> > > I. Hallucinations, delusions or paranoid thinking; or
> > 2. Manic syndrome characterized by at least three of the following:
> > > a. Hyperactivity; or
> > > b. Pressure of speech; or
> > > c. Flight of ideas; or
> > > d. Inflated self-esteem; or
> > > e. Decreased need for sleep; or
> > > f. Easy distractibility; or
> > > g. Involvement in activities that have a high probability of painful
> > > consequences which are not recognized; or
> > > h. Hallucinations, delusions or paranoid thinking; or
> > 3. Bipolar syndrome with a history of episodic periods manifested by the full
> > symptomatic picture of both manic and depressive syndromes (and currently
> > characterized by either or both syndromes);
> And

B. Resulting in at least two of the following:
    1. Marked restriction of activities of daily living; or
    2. Marked difficulties in maintaining social functioning; or
    3. Marked difficulties in maintaining concentration, persistence, or pace; or
    4. Repeated episodes of decompensation, each of extended duration;

Or

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
    1. Repeated episodes of decompensation, each of extended duration; or
    2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
    3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04.

The plaintiff argues that he met part A of the Listing since he satisfied the requirements for depressive syndrome, manic syndrome, and bipolar syndrome. Docket Entry No. 14-1, at 16-18. Although the plaintiff contends that he exhibits all eight symptoms of depressive syndrome, Listing 12.04 only requires an individual to have four of the eight symptoms to meet the depressive syndrome criteria. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(A)(1). The record evidence clearly shows that the plaintiff met the requirements of depressive syndrome since he had symptoms of "[a]ppetite disturbance with change in weight, [s]leep distrubance, [f]eelings of guilt or worthlessness, and [t]houghts of suicide." *Id.*

The record medical evidence supports the plaintiff's contention that he suffered from changes in weight and appetite disturbance. Dr. Adetunji's February 1, 2002, discharge summary indicates that at intake the plaintiff complained of appetite loss and of having lost 20 pounds in one month. (Tr. 119.) A month and a half later, when the plaintiff was admitted to the Psychiatric

31

Hospital at Vanderbilt University, he stated that he had an increased appetite and gained 40 pounds over a 15 month period. (Tr. 138.) Yet, progress notes from the plaintiff's stay at the Psychiatric Hospital describe his appetite as "poor" and "not good." (Tr. 146-48.) Further, after examining the plaintiff on December 4, 2002, Dr. Montgomery reported that he "was much thinner than [at] his last admission." (Tr. 260.) The record medical evidence clearly shows that the plaintiff had appetite disturbances and changes in weight.

The medical evidence in the record also shows that the plaintiff suffered from sleep disturbances. Dr. Adetunji's discharge summary noted that the plaintiff complained of sleeping poorly. (Tr. 119.) Additionally, the Progress Notes from the plaintiffs psychiatric hospitalization indicate that he slept poorly (Tr. 142-59) and that his sleeping improved only after he was given medication. (Tr. 143, 145-48, 153, 156-57.) Thus, the evidence in the record supports the plaintiff's assertion that he suffered from sleep disturbance.

The plaintiff also contends that he had feelings of guilt or worthlessness and on several occasions he complained to medical professionals of such feelings. (Tr. 119, 122, 124, 138, 177, 245.) The plaintiff's statements are inherently subjective in nature, but there is no indication from the medical professionals that his statements lacked credibility. *Id.* Lastly, the record medical evidence shows that the plaintiff exhibited suicidal thoughts. The plaintiff was admitted to the hospital or taken to the emergency room on several occasions for either suicidal ideation or attempting to commit suicide. (Tr. 118-36, 137-59, 259-62, 271-78.) The plaintiff was treated for suicidal ideation on each visit and his January 29, 2002, intake summary indicates that he had specifically intended to commit suicide by overdosing on drugs or driving his car into a tree. (Tr. 122.)

32

The ALJ's determination that the plaintiff did not satisfy part A of Listing 12.04 is not supported by substantial evidence since the record medical evidence clearly indicates that the plaintiff exhibited at least four symptoms of depressive syndrome. Since part A requires an individual to exhibit symptoms of either depressive syndrome, manic syndrome, or bipolar syndrome, and the plaintiff had symptoms of depressive syndrome, it is not necessary to address whether the plaintiff had symptoms of manic syndrome or bipolar syndrome. Thus, the Court's analysis turns to part B of Listing 12.04.

The plaintiff contends that the ALJ erred in determining that he did not meet part B of Listing 12.04. Docket Entry No. 14-1, at 17. The plaintiff specifically points to the functional limitations that Dr. Regan assigned to him as support for his argument. *Id.* For the plaintiff to satisfy part B of Listing 12.04, he must exhibit two of the following: "[m]arked restriction of activities of daily living; or [m]arked difficulties in maintaining social functioning; or [m]arked difficulties in maintaining concentration, persistence, or pace; or [r]epeated episodes of decompensation, each of extended duration." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(B). However, Dr. Regan opined that the plaintiff had only "mild" restrictions of activities of daily living and "mild" difficulties in maintaining social functioning. (Tr. 196.) Dr. Regan also determined that the plaintiff had "moderate" difficulty in maintaining concentration, persistence, and pace, and one or two episodes of decompensation of extended duration. *Id.* Similarly, Dr. Welch opined that the plaintiff had "mild" restrictions of his activities of daily living, and "moderate" difficulties in maintaining social functioning and in maintaining concentration, persistence, and pace. (Tr. 252.) He determined that the plaintiff had one or two episodes of extended decompensation. *Id.* Since neither Dr. Regan nor Dr. Welch concluded that the plaintiff's functional limitations were markedly limited, the plaintiff

33

did not satisfy the requirements in part B of Listing 12.04. Therefore, the ALJ's determination that the plaintiff did not meet his burden regarding part B of Listing 12.04 is supported by substantial evidence in the record.

The plaintiff contends that even if he did not satisfy part A and part B of Listing 12.04, the ALJ erred in finding that he did not meet part C of Listing 12.04. Docket Entry No. 14-1, at 10-16. For a person to be found disabled under part C of the listing, that individual must have a "[m]edically documented history of a chronic affective disorder" that has lasted for at least two years and "has caused more than a minimal limitation of ability to do basic work activities." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(C). The listing also requires a person to have one of the following: "[r]epeated episodes of decompensation, each of extended duration; or a residual disease process" that causes an individual to decompensate even at the slightest change in mental demands or environment; or the "inability to function outside a highly supportive living arrangement" for at least one year. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(C)(1)-(3). The regulations define episodes of decompensation as being "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(4). The regulations provide that a person suffers from repeated episodes of decompensation, each of extended duration when that person has "three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." *Id.* However, more frequent episodes of shorter duration or less frequent episodes of longer duration may be substituted if their functional effects equal the severity of the time requirements provided in the definition. *Id.*

34

As support for his assertion that he meets part C of Listing 12.04, the plaintiff claims that beginning on January 29, 2002, he suffered seven episodes of decompensation. Docket Entry No. 14-1, at 10-12. Although the Commissioner agrees with the plaintiff's claim that he suffered from a chronic affective disorder for at least two years that has caused more than a minimal limitation in his ability to do basic work activities, satisfying the introductory language of part C, he contends that the plaintiff is incorrect in arguing that his hospitalizations equal the severity of three two-week long hospitalizations. Docket Entry No. 21, at 15-17. Of the plaintiff's seven alleged episodes of decompensation, none lasted for two weeks or longer and his longest period of hospitalization, at the Psychiatric Hospital at Vanderbilt University, was for one week. (Tr. 118, 137, 259, 271, 281, 286, 429.) During each hospitalization for attempted suicide and suicidal ideation, prescribed medication improved the plaintiff's condition and behavior. (Tr. 121, 139, 261.) Furthermore, the plaintiff's alleged episodes of decompensation on February 7, 2002, and May 18, 2003, were only mentioned in Dr. Williams's progress notes and not supported with actual medical records of the hospitalizations. (Tr. 281, 429.) The ALJ's determination that the plaintiff's episodes of decompensation did not meet or equal part C of the listing is supported by substantial evidence in the record since none of the plaintiff's hospitalizations lasted for more than a week or occurred with a level of frequency that would satisfy the requisite severity.

### 2. The ALJ did not take record evidence out of context to support his decision.

The plaintiff argues that the ALJ "took quotes from the record and [made] them say the very opposite of what in fact they do say." Docket Entry 14-1, at 5. First, the plaintiff contends that the ALJ misreported Dr. Adetunji's discharge summary from February 1, 2002, since he stated that

35

Dr. Adetunji indicated that the plaintiff "had no suicide plan" (Tr. 24) although Dr. Adetunji's report noted that the plaintiff contemplated "killing himself with the specific plan of running his car into a tree or taking a drug overdose." (Tr. 118.) However, Dr. Adetunji's discharge summary contains both contradictory pieces of information. Dr. Adetunji reported that the plaintiff called "the mental health center" and revealed his plan to run his car into a tree or overdose on drugs. (Tr. 118.) He also noted that upon admission to MTMHI, the plaintiff "voiced suicidal ideation however he was without a plan." (Tr. 120.) There is an obvious discrepancy between both pieces of recorded information, but this discrepancy stems from the what the plaintiff reported to MTMHI compared to what he reported to Dr. Adetunji and not from any contextual distortion committed by the ALJ.

The plaintiff also contends that the ALJ "cherry picked" information from Dr. Adetunji's discharge summary. Docket Entry 14-1, at 6. Specifically, the plaintiff argues that when the ALJ indicated that Dr. Adetunji described the plaintiff's thoughts as "logical and goal directed," the ALJ did not include the remainder of Dr. Adetunji's description which stated "and centers on his intrusive thoughts of self-harm and worsening depression," and when the ALJ noted that Dr. Adetunji reported that the plaintiff's "[r]eliability is questionable," he took that comment out of context. (Tr. 24, 120) While it is true that the ALJ did not refer to the portion of Dr. Adetunji's report describing the plaintiff's "intrusive thoughts of self harm and worsening depression," the same report indicated that a day after being admitted, the plaintiff "denied homicidal or suicidal ideation" and "exhibited no suicidal gestures." (Tr. 120-21.) The ALJ is permitted to weigh the record evidence and make determinations on conflicting pieces of the evidence, even when that information is being taken from the same medical report. *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009). Further, the ALJ did not take Dr. Adetunji's statement that the plaintiff's

36

"[r]eliability is questionable" out of context. The ALJ took the exact phrase from Dr. Adetunji's report. (Tr. 120.)

The plaintiff then challenged the ALJ's finding that "[the plaintiff's] functioning has been consistent with him doing what he wants to do or what he chooses to do" (Tr. 26) and argued that the medical reports to which the ALJ cited, completed by Dr. Adetunji and Dr. Montgomery, do not support his conclusion. Docket Entry 14-1, at 6. However, each of the reports in question do support the ALJ's determination that the plaintiff is able to function on his own. (Tr. 26.) Dr. Adetunji indicated that after the plaintiff's medication was adjusted he was able to interact positively with others and could independently follow-up with a psychiatrist and case manager. (Tr. 121.) Dr. Montgomery's medical reports revealed a similar level of confidence in the plaintiff's ability to function independently. He noted in his March 20, 2002, discharge summary that after the plaintiff's medication was adjusted, the plaintiff got out of his bed, interacted socially with his peers, sang and played guitar for other patients, led patients in Bible study, and participated in group sessions. (Tr. 398.) In Dr. Montgomery's December 10, 2002, discharge summary he found that once the plaintiff began re-taking his prescribed medication, "[h]e became involved in the milieu, attended groups, increasingly became more active on the unit, [and was] more social with [his] peers and [the] staff." (Tr. 418.) Thus both Dr. Adetunji's and Dr. Montgomery's medical reports support the ALJ's conclusion that the plaintiff is able to maintain an independent level of functioning.

37

### 3. The Appeals Council and ALJ properly considered the full record.

The plaintiff contends that the Appeals Council failed to review the full record since it did not address or discuss the thirteen exhibits that he submitted subsequent to the ALJ's decision.[27] Docket Entry 14-1, at 9. On March 30, 2006, the plaintiff sent Exhibits "A" through "M" to the Appeals Council and the Appeals Council acknowledged receiving the exhibits in an letter sent to the plaintiff on July 20, 2006. (Tr. 14.) However, the plaintiff argues that since the thirteen exhibits were not a part of the Administrative Record filed in this court, there is no evidence that the Appeals Council actually reviewed the exhibits. Docket Entry 14-1, at 1-2.

The government correctly points out that of the thirteen exhibits submitted, only Exhibit A and Exhibit M are new evidence since Exhibits B through L were already a part of the record. Docket Entry 21, at 11-12. Exhibit A consists of progress notes from therapy sessions conducted by Megan Simmons and Ms. Hiers between February 28, 2006, and March 28, 2006, and a Medical Source Statement of Ability to do Work-Related Activities (Mental) completed by Ms. Hiers on March 28, 2006. Exhibit M is a work and earnings affidavit signed by the plaintiff acknowledging that in January of 2005, he assisted a friend in setting up a computer store but received "little or no monetary compensation" for his help, and that in "late May of 2005 to early August 2005" he worked "between 25 to 40 hours per week" for Swanson Christian Products. Docket Entry No. 18-14.

The Regulations clearly state that

---

[27] Both the plaintiff and the Commissioner refer to the exhibits in question, Exhibits A through M, as the "twelve exhibits" or the "twelve attachments." Docket Entry 14-1, at 2 and Docket Entry 21, at 11. However, the exhibits are labeled "A" through "M" and total 13, not 12.

> [i]f new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision. The Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the administrative law judge hearing decision.

20 C.F.R. § 404.970(b). *See also Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001) ("[T]his court has repeatedly held that the evidence submitted to the Appeals Council after the ALJ's decision cannot be considered part of the record for purposes of substantial evidence review."); *Hammond v. Apfel*, 2000 WL 420680, at *6 (6th Cir. Apr. 12, 2000) ("[t]he Appeals Council may consider new evidence pursuant to 20 C.F.R. § 404.970"). Thus, even if the Court found that there is a presumption that the Appeals Council did not review Exhibit A, it is of no import since the medical reports in Exhibit A are dated no earlier than February 28, 2006, nearly two months after the ALJ submitted his final decision. Docket Entry No. 14-2 to 14-9.

Although Exhibit M details the plaintiff's work history from 2005, the year before the ALJ submitted his final decision, and this evidence could have been considered by the Appeals Council under 20 C.F.R. § 404.970(b), the Court finds that the plaintiff's work history is immaterial since the issue of whether the plaintiff continued to perform substantial gainful activity after his alleged onset date is not before this Court. The Court understands that the plaintiff may have submitted Exhibit M to allay any concerns that the Appeals Council might have raised, given the ALJ's finding that "the record is unclear whether the [plaintiff] has engaged in substantial gainful activity since the alleged onset date" (Tr. 27), and to ensure that if the Appeals Council remanded the case back to the ALJ, the plaintiff's updated work history might prevent the ALJ from deciding this case at step one of the five step sequential review process. Yet, once the Appeals Council denied the plaintiff's request for review and effectually finalized the ALJ's decision as the decision of the

Commissioner (Tr. 17), the question before the Court became whether substantial evidence supported the ALJ's determination that the plaintiff could perform his past relevant work as an engraver and not whether the plaintiff was continuing to perform substantial gainful activity. Thus, the Appeals Council alleged failure to review Exhibit M is immaterial since the plaintiff's case was decided at step four of the sequential review process.

The plaintiff then argues that the ALJ committed reversible error by not considering "all the evidence that was properly before him" since he did not "discuss the plaintiff's mother's testimony or the letter from [the] plaintiff's sister, Kristi Miracle Cochrane." Docket Entry No. 14-1, at 9. The regulations provide that the ALJ "*may* also use evidence from other sources to show the severity of [the plaintiff's] impairment(s) and how it affects [his] ability to work" and "other sources" can include such non-medical sources as spouses, parents, care givers, siblings, relatives, friends, neighbors, and clergy. 20 C.F.R. § 404.1513(d) (emphasis added). It is clear that the use of "may" in 20 C.F.R. § 404.1513(d) allows the plaintiff to present an array of evidence to support his contention that he is disabled, but it does not "indicate that the ALJ *must* state in his decision" the weight he gave to the letter from the plaintiff's sister or to the testimony of the plaintiff's mother. *Patrick v. Astrue*, 2008 WL 3914921, at *3 (E.D.Ky. Aug. 19, 2008) (emphasis in original) ("If [20 C.F.R. § 404.1513(d)] was intended to require an ALJ to articulate reasons for rejecting lay witness testimony it would have been phrased like 20 C.F.R. § 404.1527(d)(2) (2007), which requires an ALJ to indicate specific reasons for rejecting the opinion of a treating physician.").

Even if an ALJ does not address lay witness testimony, a plaintiff has "received a full and fair explanation of the grounds for denial of [his] application [for disability]" if the ALJ stated that he reviewed the entire record and provided a detailed discussion of the medical evidence which

"[made] it clear that [he] did not credit any testimony at variance with the objective record." *Higgs*, 880 F.2d at 864. The ALJ clearly stated in his decision that he thoroughly reviewed the entire record (Tr. 20) and he evaluated, in great detail, the plaintiff's medical reports. (Tr. 22-27.) Thus, the ALJ afforded the plaintiff sufficient reasoning for his findings and overall determination that the plaintiff was not disabled.

### 4. The ALJ erred by classifying the plaintiff's past work as an engraver as being unskilled.

The plaintiff argues that the ALJ incorrectly classified his previous work as an engraver as being unskilled and that the mis-classification is reversible error. (Docket Entry 14-1, at 7.) During the plaintiff's second hearing, VE Sturgill testified that he agreed with the work classifications that VE Doss provided at the plaintiff's first hearing, which included classifying work as an engraver as being "sedentary and skilled." (Tr. 513, 554-55.) However, during the plaintiff's second hearing the ALJ and VE Sturgill repeatedly referred to work as an engraver as being "unskilled." (Tr. 557-61.) Further adding to the confusion, the ALJ acknowledged in his decision that the plaintiff's past work as an engraver would be classified as "sedentary [and] skilled" (Tr. 21), but he determined that the plaintiff is limited to performing "all but unskilled work" (Tr. 26) and concluded at step four of the five step sequential process that the plaintiff could perform his past relevant work as an engraver. (Tr. 28.)

ALJs have an "affirmative duty" to ask VEs whether "the evidence that they have provided 'conflicts with the information provided in the DOT [Dictionary of Occupational Titles].'" *Lindsley v. Comm'r of Soc. Sec*, 560 F.3d 601, 606 (6th Cir. 2009) (quoting S.S.R. 00-4p, 2000 WL 1898704, at 4). An ALJ's failure to specifically question the VE about any conflicts his evidence may have

with the DOT is typically viewed as harmless error. *Fleeks v. Comm'r of Soc. Sec*, 2009 WL 2143768, at *6 (E.D. Mich. July 13, 2009); *Masters v. Astrue*, 2008 WL 4082965, at *3 (E.D. Ky. Aug. 29, 2008). However, when the VE's testimony is in conflict with the DOT, the ALJ has the additional duty to obtain a reasonable explanation for the discrepancy. *Fleeks*, 2009 WL 2143768, at 6; S.S.R. 00-4p, at 4 ("When vocational evidence provided by a VE or VS [vocational specialist] is not consistent with information in the DOT, the adjudicator must resolve this conflict before relying on the VE or VS evidence to support a determination or decision that the individual is or is not disabled. The adjudicator will explain in the determination or decision how he or she resolved the conflict."). Thus, if there is no inquiry into whether the VE's testimony is consistent with the DOT and there is, in fact, an inconsistency, the ALJ's error is not harmless. *Lancaster v. Comm'r of Social Security*, 228 Fed. Appx. 563, 575 (6th Cir. April 26, 2007); *Fleeks*, 2009 WL 2143768, at 6.

It is quite clear from the hearing transcripts that there is an inconsistency between how the two VEs classified the plaintiff's past work as an engraver. VE Sturgill testified that he agreed with VE Doss's classification from the plaintiff's first hearing of an engraver as being skilled work (Tr. 513, 554), but during the remainder of the plaintiff's second hearing he and the ALJ described the plaintiff's past work as an engraver as being unskilled. (Tr. 557-61) However, VE Sturgill's classification of work as an engraver as being unskilled was inconsistent with the DOT.

The DOT differentiates between occupations according to their specific vocational preparation ("SVP").[28] U.S. Dep't of Labor, Dictionary of Occupational Titles 1009 (4th ed. 1991)

---

[28] The SVP is "defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." DOT at 1009. It is measured on a scale from 1-9 on which the higher

42

("DOT"). Unskilled work has an SVP of one or two, semi-skilled work has an SVP between three and six, and skilled work has an SVP between seven and nine. S.S.R. 00-4p, at 3. All of the engraving occupations listed in the DOT have an SVP of three or more, meaning that those positions are considered, at the very least, to be semi-skilled levels of work. DOT at 530, 537, 593, 623, 688-89, 755, 803-04, 975, 987-89, 990. Thus, there is a conflict between the DOT classification and VE's and the ALJ's determination that the plaintiff's past work as an engraver is unskilled.

Given the inconsistency between VE Sturgill's testimony and the DOT, and the ALJ's failure to inquire about that inconsistency, the ALJ clearly did not comply with S.S.R. 00-4p. Furthermore, the ALJ erred by deciding this case at step four of the five step sequential process when he relied upon the VE Sturgill's flawed testimony (Tr. 27) that the plaintiff could perform unskilled work and thus his past relevant work as an engraver. (Tr. 557-61.) The ALJ cannot rely on VE Sturgill's testimony that the plaintiff is limited to performing only unskilled work, such as engraving (Tr. 557-61), when the DOT classifies the various engraving occupations as being at least semi-skilled work. DOT at 530, 537, 593, 623, 688-89, 755, 803-04, 975, 987-89, 990. The ALJ should have continued to step five of the five step sequential process and determined whether there were other occupations in the national economy that the plaintiff could perform given VE Sturgill's finding that he could perform only unskilled work. The ALJ's reliance on VE Sturgill's inconsistent testimony and his failure to perform step five of the five step sequential process is reversible error.

---

the number assigned to a job, the greater the skill that is required to perform that job. *Id.*

# V. CONCLUSION

The Court is aware that the Appeals Council has remanded this case to the ALJ once before, and acknowledges that the plaintiff is adamantly opposed to another remand. However, the Court is compelled to remand this case back to the ALJ for a second time so the plaintiff's claim will receive a fair resolution. (Tr. 350-52.) Although an ALJ's failure to ask the VE whether his testimony is consistent with the DOT is typically considered harmless error, this case is a good example of why it is important for an ALJ to comply with the S.S.R. 00-4p requirement that a VE discuss any potential conflicts between his testimony and the DOT. On remand, the ALJ should be directed to resolve the inconsistency between VE Sturgill's testimony and the DOT and to conduct a step five analysis to determine what substantial gainful employment, if any, the plaintiff is capable of performing.

Case 3:06-cv-00918   Document 29   Filed 12/04/09   Page 44 of 45 PageID #: 224

## VI. RECOMMENDATION

For the above stated reasons it is recommended that the plaintiff's motion for judgment on the record (Docket Entry No. 14) be GRANTED to the extent that the case be remanded to the ALJ for further proceedings.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within ten fourteen (14) days of service of this Report and Recommendation, and must state with particularity the specific portions of this Report and Recommendation to which the objection is made. Failure to file written objections within the specified time can be deemed a waiver of right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed. 2d 435 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully Submitted,

JULIET GRIFFIN
United States Magistrate Judge

45